

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 2-09-021-CR

BRANDON LYNN HAMPTON                                    APPELLANT

V.

THE STATE OF TEXAS                                              STATE

------------

### FROM THE 367TH DISTRICT COURT OF DENTON COUNTY

------------

## MEMORANDUM OPINION[1]

------------

## I. INTRODUCTION

Appellant Brandon Lynn Hampton appeals his conviction for the murder of his seventeen-month-old son, Jody. Jody was injured while in Hampton's care when Jody's mother was at work. Jody died of his injuries two days later. In four points, Hampton argues that the trial court erred by denying his request

---

[1] *See* Tex. R. App. P. 47.4.

that a lesser included charge of deadly conduct be included in the jury charge, that the evidence is legally and factually insufficient, and that the trial court erred by admitting the testimony of two experts. After this case was submitted, Hampton filed a motion to withdraw his first and fourth points. We granted the motion and therefore will address only his second and third points dealing with the sufficiency of the evidence. We will affirm.

## II. FACTUAL BACKGROUND[2]

### A. Before "The Fall"

Hampton, Jody, and Jody's mother Melissa Mena lived together at the Rosemeade Apartments. Brian Adkins lived in a nearby apartment on the same floor. Adkins testified that on the morning of May 25, 2007, his apartment door was open, and he heard yelling followed by two back-to-back thuds. He said that the two thuds came from the second floor and sounded like something hitting the wall or the floor twice; the noise did not sound like a child falling down stairs. Adkins walked to his apartment door and did not see anything outside. He said that if Jody had fallen down the stairs, he would have seen Jody because from his doorway, he had "no choice but to see the stairwell."

---

[2] Because the evidence presented by the State is primarily circumstantial, we provide a detailed recitation of the facts.

2

## B. "The Fall"

Hampton told the police that after Melissa left for work on the morning of May 25, he decided to take Jody to McDonald's for breakfast. He said that he was holding Jody's hand when they exited the apartment but said that he had to let go of Jody's hand to lock the door. As he was locking the door, he heard "plunk, plunk" and saw Jody on the stairs. He could not remember if it was two, three, or four steps that Jody fell down.

Melissa testified that Jody was fine when she left him with Hampton on May 25 and went to work. After she arrived at work, she received a call from Hampton, saying that Jody was not breathing. She rushed home, and when she arrived about ten minutes later, Jody was not conscious, his eyes were closed, and his body was stiff. Hampton told her that Jody had fallen down the stairs. Melissa told Hampton to breathe into Jody's mouth while she called 911.

## C. Testimony from Those at the Apartment Complex

Fady Abdo, Hampton's neighbor, testified that on the day in question, he saw Hampton come running out of his apartment, crying out for help. Hampton and Melissa asked Abdo to perform CPR on their baby, but Abdo told them that the baby needed a doctor because he was breathing but his eyes were not responding. Hampton was nervous and angry that the ambulance did not arrive

3

immediately.  Hampton told Abdo that Jody had fallen down the stairs and said, "I'm in trouble."

Michael Bender, who was in charge of the maintenance at the Rosemeade Apartments, testified that he saw an emergency squad in front of Hampton's apartment building on the day in question.  He heard a neighbor crying, "That baby, that baby, that poor baby is hurt."  Bender saw Hampton come out of his apartment and walk down the stairs, and Bender heard Hampton scream, "Shit, shit," as he clenched his fists and exhibited a mad facial expression.

Donna Jones, who lived in the apartment across from Hampton and used to babysit Jody, remembered the ambulance coming on May 25 and hearing Hampton tell the paramedics, "Hurry up, he's not breathing."  She saw Jody in the middle of the floor with his eyes and mouth half open; his chest was up like he was taking a deep breath, but his stomach was flat.  The paramedics asked her, Hampton, and Melissa to leave, and Hampton stood over Melissa "beating like this"[3] and saying, "You is the one who caused this; you is the one who caused this."  Jones said that the paramedics left with Jody on a stretcher.

---

[3] From the record, we cannot tell what motion Jones was describing.

## D. The Paramedics' Observations

William Bostwick, a firefighter and paramedic with the City of Dallas Fire/Rescue Department, testified that he arrived at the Rosemeade Apartments on May 25 after receiving a call about an unconscious person. He said that Hampton was hollering from the second-floor balcony that the patient had stopped breathing and was yelling, "Save my son, save my son." Hampton scooped up Jody from the couch and brought him to the paramedics, frantically asking them to hurry and get Jody to the hospital. Bostwick took Jody and laid him on the living room floor. Hampton said that Jody had fallen down a flight of concrete stairs. Bostwick looked through Jody's scalp and did not see any abrasions but noted that he was unconscious and thought that Jody's injuries must have been caused by trauma. Before placing a cervical collar on Jody's neck, Bostwick noticed that there was a scratch on the left side of Jody's neck that was consistent with a fingernail scratch. He could not say how the scratch occurred, nor could he say that Jody's injuries were not the result of an accident; the Dallas Fire Department described the injuries as unintentional.

Spencer Smith, a flight paramedic with Care Flite, testified that he took Jody to Children's Medical Center in Dallas via helicopter. He noted that Jody's airways were partially obstructed, that he had a decreased level of

consciousness, and that he was "posturing," which was an indication of a head injury.

### E. At the Hospital

Dr. Matthew Cox, who is an assistant professor of pediatrics at UT Southwestern Medical School and is the medical director of the child abuse evaluation team at Children's Medical Center, testified that he has been doing child abuse evaluations for six and a half years and sees 250–300 cases a year. When Jody presented to the emergency department at Children's Medical Center on May 25, Dr. Cox was contacted to help with the evaluation due to the severity of Jody's head injury.[4] Jody presented with a severe, life-threatening head injury and associated retinal hemorrhages, and the initial history of falling down the stairs was not of a severity to adequately explain the extent of his injuries.

When Dr. Cox went to the emergency room, he saw that Jody was on life support, that he was not responsive, and that he was being prepped for brain surgery. He quickly looked at Jody and noted that he had an abrasion and some surrounding bruising on the left side of his forehead, that he had a red

---

[4] Dr. Cox testified that it is hospital protocol for the emergency department to contact the child abuse evaluation team when there are concerns about a child's injury.

6

abrasion on the side of his neck,[5] and that there was not any significant swelling or injury to the scalp tissue. Dr. Cox also saw that Jody had a patterned scar on his left buttock, a loop mark on his "left butt cheek," some linear scars on his other "butt cheek," and straight line scars on the outer part of his left leg. Jody had no broken bones and no signs of abdominal injuries.

Dr. Cox then went to the emergency room's waiting room to attempt to get a history from Jody's parents. When Dr. Cox asked Jody's parents for a history, they told him "no" and that they had already talked to the doctors and were not going to talk to anyone else. This concerned Dr. Cox because no family had ever refused to provide information, and he believes that parents are the best source of information. While Dr. Cox attempted to question Hampton, he was angry and yelling, and a security guard was called to calm him down. Ultimately, Hampton said that Jody had fallen down four or five stairs and that he was limp when he picked him up. Hampton said that he called Jody's mother and that they called 911 after she returned home from work.

Dr. Cox testified that Hampton's explanation — that Jody fell down several stairs — was not consistent with Jody's injuries. Dr. Cox said that stairway falls

---

[5] After seeing a photo depicting the abrasion on Jody's neck, Dr. Cox noted that the abrasion had no scab, that it appeared to be new, and that it had characteristics similar to fingernail scratches because there was a peeling of the outer layer of skin.

7

typically cause bumps and bruises and that concrete steps usually cause skin injuries. Dr. Cox stated that children have a tendency to fall head down because their heads are disproportionately larger than the rest of their bodies. Consequently, a child falling down stairs usually endures a series of falls and has minor, superficial, nonfatal injuries, like a bump on the head.

But here, Jody had no skin injuries on his head other than a superficial abrasion on the left of his forehead[6] and one along the side of his neck, a location that Dr. Cox noted would be unusual for a fall down stairs, and yet Jody's CT scan showed bleeding around Jody's brain and brain swelling. Dr. Cox explained that the subdural hemorrhage and hematoma (i.e., blood that was collecting) on the right side of Jody's brain was exerting pressure on the brain and causing a midline shift of the brain structures. Dr. Cox explained that typically, subdural hemorrhages are indicators of a traumatic event, as are retinal hemorrhages. Dr. Cox testified that Jody underwent a craniotomy to drain the blood that was exerting pressure on his brain.

Dr. Cox opined that Jody's injuries were the result of severe traumatic forces because Jody's height and weight would not have generated enough

---

[6] Dr. Cox could not say whether the abrasion on the left side of Jody's forehead occurred with the severe head injury. He did not see any external injuries to suggest the point of impact.

force to cause this kind of injury by falling down four or five steps. Based on Dr. Cox's training and experience, he opined that some object had to strike Jody in the head or that he struck some object with his head in order to cause his injuries or that shaking could have caused his injuries.[7] He did not think it was an accident because of the severity of Jody's injuries. Instead, he said that there was no indication of anything other than trauma causing the hemorrhage.

During cross-examination, Dr. Cox agreed that short falls can produce intracranial hemorrhaging but that he does not see that very often.[8] Dr. Cox agreed that if Jody had recently injured his neck from the fall on the stairs, he could have, if the fall was severe enough, suffered bleeding from arteries and veins in the lower portion of his neck. Dr. Cox did not agree, however, that if there had been bleeding in Jody's neck that no one noticed that it could account for some of the hemorrhaging that was attributed to the front right of his brain. Dr. Cox said that no other area of hemorrhaging was noted other than that seen in the CT scan on the right top side of the brain. Moreover,

---

[7] Dr. Cox could not quantify how much force it would take to cause this type of injury and said that he was not comfortable discussing mens rea because he did not know the intent or motive.

[8] Dr. Cox was presented with a paper used by the defense, discussing a study of 363 children who had been involved in stairway falls; of those in the study, zero went to the ICU and zero died.

there were no medical findings to suggest that Jody had any preexisting conditions; Jody's pediatrician told Dr. Cox that Jody had been otherwise healthy and had normal development. And because Jody was walking and acting normally earlier that day, Dr. Cox testified that it was highly unlikely that Jody had brain swelling before May 25. Instead, Dr. Cox stated that based on the symptoms Jody presented with, he had a new head injury, and Dr. Cox's best medical evaluation was that Jody's injury occurred right before he developed neurological symptoms when he was found limp.

Dr. Cox testified that Jody ultimately died on May 27, two days after he was admitted to the hospital. When asked to explain what caused Jody's death, Dr. Cox testified that Jody was brain dead; he did not have signs of neurologic function as a result of a brain tissue injury that led to a fatal intracranial injury.

### F. Autopsy Findings

Dr. Reade Quinton of the Dallas County Medical Examiner's Office performed the autopsy on Jody.[9] He noted no evidence of bruising on Jody's back, legs, or arms but found a few small scars on the right and left buttocks

---

[9] Dr. Quinton admitted that he made a mistake in his autopsy report when he used standard language to describe Jody's kidneys, which were absent because they had been harvested prior to the autopsy.

that were consistent with trauma and a small linear red abrasion on the left side of Jody's neck. There were dark areas evidencing trauma to the scalp, but Dr. Quinton said that some of that was caused by the craniotomy.

Dr. Quinton said that the eyes are removed in autopsies, particularly when children have suffered head injuries, because it may show a manifestation of trauma. He explained that retinal hemorrhaging shows trauma because it reveals an increase in pressure in the head. Here, when Dr. Quinton removed Jody's eyes, he saw a number of small, dot-like retinal hemorrhages that were distributed over the retinas in both eyes. Dr. Quinton stated that there was increased pressure in Jody's brain because there was a large subdural hematoma taking up space in his skull; Dr. Quinton said that when there is an injury to the brain that causes it to swell, there is no place for it to go but down to the base of the brain stem, where it can shut down the respiratory system and ultimately cause death.

Dr. Quinton stated that his autopsy findings all fall under the heading of "blunt force injury of the head": there was diffuse soft tissue hemorrhage of the right side of the scalp (i.e., bleeding under the scalp); patchy subdural hemorrhage on both the right and left sides, but greater on the right side; patchy subarachnoid hemorrhage, which is basically an additional hemorrhage right over the surface of the brain itself; the optic nerve sheath hemorrhage;

11

retinal hemorrhages; prominent cerebral edema (i.e., swelling of the brain); evidence of surgical intervention (i.e., craniotomy); and scattered small abrasions on the left side of the face and neck. He noted nothing significant during the internal exam of Jody's organ systems and no previous skull fractures. Instead, he said that Jody's severe head trauma was an acute injury that had not had time to heal.

Dr. Quinton could not tell the jury what force was used but disagreed with Dr. Cox that a seventeen-month-old child could be exclusively shaken to death without some type of impact as well; Dr. Quinton opined that this was not a shaking case. He clarified that he could not say that there was not some shaking, but he did not care about that because this case involved an impact. Dr. Quinton also disagreed with Dr. Plunkett's stance, as set forth in a study paper introduced by the defense, that short falls can kill children.

To determine the cause and manner of Jody's death, Dr. Quinton spoke to the police and reviewed the crime scene investigation.[10] He said that the findings did not match the story that the child had fallen down four or five stairs because the force of falling down a few stairs would not generate this type of subdural traumatic brain injury. After a fall, he would have expected to

---

[10] Dr. Quinton stated that without the crime scene investigation, he would have ruled the cause of Jody's death as undetermined.

12

see outward injuries to the scalp, but none were documented. Dr. Quinton therefore concluded that Jody's death was related to blunt force injuries to Jody's head and that the manner of his death was homicide.

## G. Findings of Investigation

Gary O'Pry, who was formerly with the Dallas Police Department's crime scene unit, testified that he went to the Rosemeade Apartments on May 26, 2007 to look for evidence and to photograph the scene. He found a child's shirt that had blood on it and noted that the neck of the shirt was torn, and he took pictures of the bedroom, showing two indentations of fist prints in the wall over the bed. He said that there were no signs of a fall on the stairs and that the only blood that was found was on the child's shirt.

Katherine Zimmer, a crime scene detective with the Dallas Police Department, testified that she took photographs of and fingernail clippings from Hampton on the evening of the incident. Another crime scene investigator, Jeffrey Coats, read the DNA test results from Hampton's fingernail clippings into evidence:

> Based on the analysis, the DNA obtained from Sample 3T1, swabbing of fingernails, right hand, of Brandon Hampton, is at least 136 million times more likely that Brandon Hampton and Jody Hampton were the sources of the DNA obtained from Sample 3T1, which is the fingernails of the right hand of Brandon Hampton . . . than if Brandon Hampton and an unknown individual were the source of the DNA obtained from 3T1, swabbing of right fingernails -- or swabbing of fingernails from right hand of Brandon Hampton.

13

Coats testified that "you'd have to grab somebody pretty hard to get skin cells underneath [your fingernails]."

## H. Result of Investigation

Sabra Garibay, a child abuse investigator with the Dallas Police Department, testified that during her interview of Hampton at the hospital, he was aggravated that he had to tell his story to her. Garibay asked Hampton how Jody had received his injuries and found it peculiar that Hampton described "snot" going everywhere because he did not mention Jody crying. Garibay said that Hampton's explanation for Jody's injuries raised red flags because Hampton talked about blood around Jody, but Jody had no cuts. Garibay also found it odd that Hampton did not call 911 before he called Melissa, even though Hampton said that Jody was gasping for breath. Hampton told Garibay during the interview that he did not want to stay and asked if he could leave; she told him he could, and he asked, "So I can just get up and walk out the door?"

After his interview, Hampton yelled at Melissa, telling her that she did not have to say anything, that she should not write anything, and that she did not have to talk to Garibay. Garibay observed that after Hampton's outburst, Melissa acted very intimidated and did not want to talk to her.

14

Garibay spoke with Dr. Cox and became increasingly concerned because Jody's medical history did not match up with the history of events given by Hampton. After speaking with Dr. Cox[11] and knowing that Hampton was Jody's sole caretaker when he was injured, Garibay arrested Hampton. The factors that Garibay took into account before making the decision to arrest Hampton included Jody's medical history, the sequence of the injury as explained by Hampton and its inconsistency with Jody's injuries, the fact that Hampton was alone with Jody when the injury occurred, and the fact that Jody was fine when Melissa left for work that morning. Garibay testified that she is confident beyond a reasonable doubt that Jody's injuries were not the result of an accident.

## I. Result of Trial

After hearing the above evidence, the jury found Hampton guilty of murder as alleged in the indictment and assessed his punishment at twenty-five years' confinement. The trial court imposed the sentence assessed by the jury, and this appeal followed.

---

[11] Garibay testified that she also spoke with people at the apartment complex and others but that her talk with Dr. Cox was more important because he is an expert in child abuse cases.

### III. STANDARDS OF REVIEW

### A. Legal Sufficiency

In reviewing the legal sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778. The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 2075 (2009). Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1131 (2000). Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all

16

the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We must presume that the factfinder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778.

## B. Factual Sufficiency

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party. *Steadman v. State*, 280 S.W.3d 242, 246 (Tex. Crim. App. 2009); *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the factfinder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the factfinder's determination is manifestly unjust. *Steadman*, 280 S.W.3d at 246; *Watson*, 204 S.W.3d at 414–15, 417. To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, although legally sufficient, contradicts the verdict. *Watson*, 204 S.W.3d at 417.

17

Unless we conclude that it is necessary to correct manifest injustice, we must give due deference to the factfinder's determinations, "particularly those determinations concerning the weight and credibility of the evidence." *Johnson v. State*, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000); *see Steadman*, 280 S.W.3d at 246. Evidence is always factually sufficient when it preponderates in favor of the conviction. *Steadman*, 280 S.W.3d at 247; *see Watson*, 204 S.W.3d at 417.

In determining whether the evidence is factually insufficient to support a conviction that is nevertheless supported by legally sufficient evidence, it is not enough that this court "harbor a subjective level of reasonable doubt to overturn [the] conviction." *Watson*, 204 S.W.3d at 417. We cannot conclude that a conviction is clearly wrong or manifestly unjust simply because we would have decided differently than the jury or because we disagree with the jury's resolution of a conflict in the evidence. *Id*. We may not simply substitute our judgment for the factfinder's. *Johnson*, 23 S.W.3d at 12; *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). Unless the record clearly reveals that a different result is appropriate, we must defer to the jury's determination of the weight to be given contradictory testimonial evidence because resolution of the conflict "often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered." *Johnson*,

18

23 S.W.3d at 8. Our deference in this regard safeguards the defendant's right to a trial by jury. *Lancon v. State*, 253 S.W.3d 699, 704 (Tex. Crim. App. 2008). An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant's complaint on appeal. *Sims v. State*, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

#### IV. SUFFICIENT EVIDENCE TO SUPPORT CONVICTION

In his second and third points, Hampton argues that the evidence is legally and factually insufficient to support his conviction. Specifically, Hampton challenges the sufficiency of the evidence to show (1) that shaking caused Jody's death, (2) that Hampton struck Jody's head or caused it to strike an unknown object, and (3) that Hampton administered a blow that had sufficient force to cause Jody's death.

#### A. Law on Murder

A person commits murder if he intentionally or knowingly causes the death of an individual or intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. Tex. Penal Code Ann. § 19.02(b)(1)–(2) (Vernon 2003).

19

## B. Legally Sufficient Evidence

Hampton combines his legal and factual sufficiency claims, which are based almost entirely on whether the State established "legal causation." Viewing the evidence in the light most favorable to the verdict, the record demonstrates that Hampton was the sole person who was present when Jody started having trouble breathing. On the morning in question, one of Hampton's neighbors heard yelling followed by two back-to-back thuds that sounded like something hitting the wall or the floor twice and did not see anything outside in the stairwell. Photographs of Hampton's bedroom revealed two fist-sized indentations in the wall. Photographs also showed that Jody's neck had a scratch on it, and DNA test results of the fingernail swabbing taken from Hampton revealed that it was at least 136 million times more likely that he and Jody were the sources of the DNA that was tested than any other two people were the sources of the DNA. Jody's shirt had a tear in the neck and had blood on it; however, no blood was found on the stairs.

Both Dr. Cox and Dr. Quinton testified that the version of events recited by Hampton about Jody's falling down four or five stairs was not consistent with the severe, fatal injuries that Jody sustained, and both doctors testified that a fall down four or five stairs could not have caused Jody's injuries. Based on Dr. Cox's training and experience, he opined that Jody's injuries were not

an accident; instead, he said that some object had to strike Jody in the head or he had to strike some object with his head in order to cause his injuries or that shaking could have caused his injuries. Dr. Quinton also concluded that Jody's death was not an accident and instead ruled that the manner of his death was homicide.

The record also reflects that Hampton failed to call 911 before calling Melissa, became hostile at the hospital when he was asked to tell his story to Dr. Cox, told Melissa not to talk to anyone at the hospital, and made incriminating statements to people at the apartment complex, including a statement that he was "in trouble."

After viewing all of the evidence in the light most favorable to the jury's verdict, we hold that a rational trier of fact could have found beyond a reasonable doubt that Hampton committed an act clearly dangerous to human life by shaking Jody, by causing Jody to strike an unknown object, or by striking Jody with an unknown object, which caused his death.[12] *See Jackson*,

---

[12] Here, Hampton's indictment contained handwritten changes that caused the indictment to read as follows:

on or about the 25th day of May, 2007, . . . did then and there commit or attempt a felony, to-wit: injury to a Child, and in the course of and in furtherance of the commission or attempt of said Injury to a Child offense, the defendant committed or attempted to commit an act clearly dangerous to human life, to wit; by shaking Jody Hampton, by causing Jody Hampton to strike an unknown

21

443 U.S. at 319, 99 S. Ct. at 2789; *Brown*, 270 S.W.3d at 568; *Clayton*, 235 S.W.3d at 778; *Kelley v. State*, 187 S.W.3d 761, 763–64 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd) (holding evidence legally sufficient to support injury to a child conviction when every expert testified that baby's injuries could not have been caused by an accident on changing table as described by appellant); *Tejeda v. State*, No. 13-95-00394-CR, 1997 WL 33641979, at *4 (Tex. App.—Corpus Christi Apr. 10, 1997, no pet.) (not designated for publication) (holding evidence legally sufficient to support conviction for murder of twenty-nine-day-old infant when expert testimony discounted appellant's stories and established that infant died from hemorrhaging around brain that could have resulted from sudden impact with hard object or from vigorous shaking). Accordingly, we hold that the evidence is legally sufficient to support Hampton's conviction, and we overrule his second point.

---

object, or by striking Jody Hampton with an unknown object, that
caused the death of Jody Hampton[.]

The jury charge tracked the indictment language above and instructed the jury
to find Hampton guilty of murder if they believed from the evidence beyond a
reasonable doubt that Hampton committed the acts alleged in the indictment.
Because the jury charge allowed the jury to find that Hampton caused the death
of Jody by shaking *or* by causing Jody to strike an unknown object *or* by
striking Jody with an unknown object, the jury was not required to find that
Hampton caused Jody's death solely by shaking him.

22

## C. Factually Sufficient Evidence

Hampton also argues that the evidence is factually insufficient to show "legal causation" because there was conflicting evidence by the experts regarding shaking, there was no direct proof of striking, and the experts could not specify an exact force.

The record reveals that the expert testimony was not conflicting; Dr. Cox included shaking as one of the ways that Jody's injuries could have been caused, and Dr. Quinton did not rule out shaking completely but instead stated that Jody's injuries could not have been caused solely by shaking and that he was more focused on the fact that there was an impact to Jody's head.

As set forth above, the jury was not required to find that Hampton caused Jody's death by both shaking and striking, but the record also contains factually sufficient evidence of striking.

The State presented circumstantial evidence of striking: a neighbor testified that he heard thuds, photographs showed indentations in Hampton's bedroom wall, and Hampton was alone with Jody when he suffered fatal head injuries. Although no one testified that Hampton struck Jody, there was no other explanation given for Jody's fatal head injuries after initial reports of an "unintentional" accident were ruled out following the crime scene investigation.

23

With regard to the force used, Dr. Cox and Dr. Quinton could not specify the exact force necessary to cause Jody's injuries but said that it was more traumatic or severe than falling down four or five stairs. Garibay said that Hampton gave the stairs as the only explanation for Jody's injuries, but the jury was free to disbelieve him.

We have reviewed the evidence in a neutral light, and we find no objective basis in the record for holding that the jury's verdict was clearly wrong or manifestly unjust or that it was contradicted by the great weight and preponderance of the evidence. *See Lancon*, 253 S.W.3d at 704; *Watson*, 204 S.W.3d at 414–15, 417. Rather, the evidence presented at trial was sufficient to support the verdict, and no contrary evidence exists that would render the evidence factually insufficient under the applicable standard of review. *See Lancon*, 253 S.W.3d at 704; *Watson*, 204 S.W.3d at 414–15, 417; *Mendoza v. State*, No. 14-95-00704-CR, 1997 WL 367938, at *3 (Tex. App.—Houston [14th Dist.] July 3, 1997, pet. ref'd) (not designated for publication) (holding evidence factually sufficient to support felony offense of injury to child when baby died of traumatic injury to the head which he suffered while in appellant's care even though mother stated that appellant had only spanked baby); *see also Kutzner v. State*, 994 S.W.2d 180, 184 (Tex. Crim. App. 1999) (reasoning that "[c]ircumstantial evidence, by itself, may be enough to support the jury's

24

verdict"). Accordingly, we hold that the evidence is factually sufficient to support Hampton's conviction, and we overrule his third point.

## V. CONCLUSION

Having overruled Hampton's second and third points, we affirm the trial court's judgment. *See* Tex. R. App. P. 47.1.


SUE WALKER
JUSTICE

PANEL: GARDNER, WALKER, and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: February 25, 2010